**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                          |     |                                  |
|--------------------------|-----|----------------------------------|
| TIMEKIA CHERRY           | :   |                                  |
|                          | :   |                                  |
|                          | :   |                                  |
|                          | :   |                                  |
| v.                       | :   |                                  |
|                          | :   | Civil Action No. CCB-08-1228     |
| FREDERICK H. BEALEFELD, III | : |                                  |
|                          | :   |                                  |

...o0o...

## MEMORANDUM

Now pending before the court is defendant's motion for summary judgment. Plaintiff Timekia Cherry has sued Frederick H. Bealefeld, III, Baltimore City Police Commissioner, in his official capacity, for violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*., alleging employment discrimination on the basis of sex and retaliation. The issues in this case have been fully briefed and no hearing is necessary.  For the reasons stated below, the defendant's motion for summary judgment will be granted.

## BACKGROUND

Ms. Cherry began working for the Baltimore Police Department ("BPD") as a police officer trainee in March 2005 and became a police officer in February 2006. Throughout her tenure with the BPD, Ms. Cherry was on probation, which is routine for trainees and first-year police officers. Upon graduating from the Police Academy, Ms. Cherry was assigned to one of the three sectors comprising the Southwest District. From February to mid-March 2006, Officer Christopher Warren

supervised Ms. Cherry in Sector Two. These two months appear to have been uneventful, as Ms. Cherry received no evaluations or reprimands.[1]

In mid-March 2006, the BPD transferred Ms. Cherry to Sector One and placed her under the supervision of Sergeant Donte Preston. Ms. Cherry was the only female in her squad. According to Ms. Cherry, Sgt. Preston discriminated against her based on her sex in a number of ways. First, she alleges that Sgt. Preston obstructed her attempts to obtain secondary employment, despite the fact that her male colleagues routinely received permission to work second jobs. When Ms. Cherry applied for work with a special police agency in July 2006, she submitted her secondary employment request to Sgt. Preston to process. Ms. Cherry claims that Sgt. Preston prevented her from working at the agency by either failing to process her request or by obtaining work at the agency himself and convincing the agency not to hire her. In addition, Ms. Cherry alleges that Sgt. Preston prevented her from obtaining secondary employment with Johns Hopkins by failing to forward her request along to the proper officials.

Second, Ms. Cherry asserts that Sgt. Preston denied her request for leave, for which she was eligible, because of her sex. According to Ms. Cherry, Sgt. Preston approved a male coworker's request for leave even though he had placed his request after her. Third, Ms. Cherry claims that Sgt. Preston punished her more harshly than her male colleagues for lateness by placing her on "foot patrol," which involved patrolling an area by foot, rather than in a police vehicle. Furthermore, while on foot patrol, Ms. Cherry was ordered to respond to a call that was a block or a block and a half away by walking. Ms. Cherry believes that Sgt. Preston would not have ordered a male police officer to walk this distance.

---

[1] Ms. Cherry's performance while in the Police Academy, however, was notably poor. During a six-month period, Ms. Cherry received reprimands for failure to complete assignments on three occasions, lateness, arriving unprepared, improper hair color, making a false statement to a sergeant, improper entry into the building, and insubordination. (*See* Def.'s Mot. for Summ. J. Exs. 4-13.)

Fourth, Ms. Cherry alleges that Sgt. Preston denied her overtime work, while granting such work to many of her male colleagues. Finally, Ms. Cherry claims that she was forced to monitor a hospitalized arrestee for a week, whereas male police officers were never given this "hospital detail." Nevertheless, she stated in her deposition that she normally took over the shift from male police officers and that male police officers routinely replaced her when her shift ended for the day. (*See* Pl.'s Opp. Ex. 2 at 65.)

In August 2006, Ms. Cherry contacted the Equal Employment Opportunity Commission ("EEOC") and lodged an informal complaint of sex discrimination by the BPD. She then informed Sergeant Whilkettle, of the Internal Investigation Department, of her informal complaint. A few days later, Ms. Cherry was transferred from Sector One to Sector Three and was told she would now receive performance evaluations every 30 days. Sgt. Preston, District Lieutenant Kenneth Stanley, and District Deputy Major Tom Cassella informed Ms. Cherry that the change was due to her negative performance evaluations and her low numbers of arrests and citations. In Sgt. Preston's first review of Ms. Cherry, covering the period from March 22, 2006 to June 30, 2006, he described her performance as "average," but noted that she was "having a hard time making the transition from civilian to police officer." (*See* Def.'s Mot. for Summ. J. Ex. 14 at 4.) Sgt. Preston's next performance review, covering the period from July 2, 2006 to September 2, 2006, described Ms. Cherry's work as "unsatisfactory," and discussed her lateness on three occasions, her use of medical leave for a claimed headache during days for which she had been denied requested leave, and her low number of arrests, field interviews, and moving violation citations. (*See id.* at 7.)

During her first 30 days in Sector Three, Ms. Cherry was supervised by Sergeant Robert Cope. In Sgt. Cope's performance review for September 2006, he stated that Ms. Cherry's work needed improvement. In addition, he wrote that "Officer Cherry needs to motivate herself to write

better reports, conduct better investigations, improve her stats, and to become a better officer." (*See* Def.'s Mot. for Summ. J. Ex. 15 at 4.) On September 21, 2006, Ms. Cherry filed an internal complaint against Major John Bevilacqua, accusing him of speaking to her in a degrading and unprofessional manner regarding her frequent use of sick days and an improperly taken overtime shift. (*See* Pl.'s Opp. Ex. 4.) On September 25, 2006, Ms. Cherry wrote Major Bevilacqua, claiming that she was being unfairly targeted by her supervisors and requesting a transfer to a different supervisor. (*See* Pl.'s Opp. Ex. 5.)

In October 2006, Sergeant Ronda Watford took over as Ms. Cherry's supervisor. In her first performance review, covering the period from October 15, 2006 to October 28, 2006, Sgt. Watford noted that she had not had the opportunity to sufficiently observe Ms. Cherry's work, but had noticed that she appeared stressed and ordered a fitness evaluation for her. (*See* Def.'s Mot. for Summ. J. Ex. 16 at 3.) As a result of this observation of stress, Sgt. Watford placed Ms. Cherry on medical leave status for three days and on light duty status until November 11, 2006. On October 25, 2006, Ms. Cherry filed an internal request to be transferred to a different district where she could "start fresh." (Pl.'s Opp. Ex. 6.) In Sgt. Watford's second review, signed on November 28, 2006, she rated Ms. Cherry's performance as "unsatisfactory" and negatively commented on her constant requests for leave. (*See* Def.'s Mot. for Summ. J. Ex. 16 at 6.) The BPD terminated Ms. Cherry's employment on December 30, 2006, noting that despite its attempts to expose her to various supervisors, Ms. Cherry's performance remained unsatisfactory. (*See* Def.'s Mot. for Summ. J. Ex. 17 at 7-8.)

Ms. Cherry filed a charge of discrimination with the EEOC on November 30, 2006, claiming discrimination on the basis of sex. She received a right-to-sue letter on January 30, 2008. Ms. Cherry subsequently filed a complaint in the Circuit Court for Baltimore City and Mr. Bealefeld

removed the case to federal court. Ms. Cherry filed her most recent amended complaint on August 4, 2008. Ms. Cherry claims that the BPD discriminated against her on the basis of sex and retaliated against her because of her EEOC complaints.

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotations omitted)

(quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

*A.  Sex Discrimination*

Ms. Cherry claims that Sgt. Preston's denial of her requests for secondary employment, leave, and overtime, in addition to his foot patrol and hospital duty assignments, constitute sex discrimination. To make out a *prima facie* case for disparate treatment based on sex, Ms. Cherry must show that (1) she is a member of a protected class; (2) she has satisfactorily performed her job; (3) she suffered an adverse employment action; and (4) similarly-situated employees outside her protected class received more favorable treatment. *See White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004); *McCain v. Waste Mgmt., Inc.*, 115 F. Supp. 2d 568, 573 (D. Md. 2000). Under the *McDonnell Douglas* burden-shifting framework, once Ms. Cherry establishes a *prima facie* case, the burden shifts to the employer to provide a legitimate nondiscriminatory reason for the adverse actions. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). If the employer is able to provide a legitimate reason for its adverse treatment, the burden shifts back to the plaintiff to prove "that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (internal quotation marks omitted).

Mr. Bealefeld concedes that Ms. Cherry is a member of a protected class and that her termination constituted an adverse employment action.[2] (*See* Def.'s Mot. for Summ. J. at 14.) He

---

[2] It should be noted, however, that Ms. Cherry's complaint does not allege that the BPD discriminated against her because of her sex when it terminated her. Instead, Ms. Cherry seems to claim that her work assignments and the denial of overtime, leave, and secondary employment were adverse actions that were motivated by sex discrimination. Mr. Bealefeld does not discuss whether these actions constitute adverse employment actions for the purposes of stating a *prima facie* case under Title VII.

argues, however, that Ms. Cherry cannot establish that she satisfactorily performed her job or that similarly-situated male colleagues received more favorable treatment.

Whether Ms. Cherry has shown that her job performance was satisfactory is doubtful in light of the many negative evaluations she received. Even if she could satisfy this aspect of the *prima facie* test, however, she has not shown that similarly-situated employees received more favorable treatment. The Fourth Circuit has noted that "[t]he similarity between comparators … must be clearly established in order to be meaningful." *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008). Ms. Cherry presumes that her male colleagues were similarly situated to her, yet fails to address the fact that as a recent Police Academy graduate, she was on probation. Ms. Cherry provides no evidence that could lead a fact finder to conclude that any of her male colleagues were also on probation. Thus it cannot be reasonably assumed that the male police officers in Ms. Cherry's squad were similarly situated to her.

Furthermore, Ms. Cherry has failed to demonstrate that her male colleagues received more favorable treatment when it came to work assignments and requests for secondary employment. Ms. Cherry stated in her deposition that she could not recall any males in her squad being denied requests for secondary employment. (*See* Pl.'s Opp. Ex. 2 at 59.) Yet she does not contest Sgt. Preston's deposition testimony that only one male officer in Ms. Cherry's squad had secondary employment and that his request was approved by a previous supervisor. (*See* Pl.'s Opp. Ex. 3 at 74.) The fact that Ms. Cherry cannot remember any male officers being denied secondary employment does not indicate that any male officers actually applied for secondary employment and were approved by Sgt. Preston. Thus there is no evidence that male police officers in Ms. Cherry's squad received more favorable treatment than her in this regard.

Similarly, there is no evidence that male police officers received more favorable treatment by not being assigned to hospital duty. Ms. Cherry contends that Sgt. Preston assigned her to hospital duty because of her sex. Although she stated in her deposition that "none of the males had been sent to the [hospital] detail," she also noted that "[u]sually, I was relieving a male officer, or I was being relieved by a male officer." (Pl.'s Opp. Ex. 2 at 65-66.) Although it is unclear whether these other male officers assigned to the hospital detail came from Ms. Cherry's squad, a fact finder could not assume, without further evidence, that they were not also assigned to the detail by Sgt. Preston. Furthermore, Sgt. Preston's testimony at his deposition, which Ms. Cherry has not contested, was that it is not unusual for an officer to be assigned the hospital detail for an entire week and that he himself has monitored prisoners at hospitals for as long as ten days in a row. (*See* Pl.'s Opp. Ex. 3 at 52-53.) Therefore, Ms. Cherry has not provided any evidence that male officers received favorable treatment with respect to working the hospital detail.

In addition, Ms. Cherry alleges that while she was ordered to patrol by foot as punishment for reporting to work late, the male officers in her squad were never subjected to such punishment. Yet Ms. Cherry offers no evidence that Sgt. Preston assigned foot patrol as a means of punishing officers or that male officers never patrolled by foot. To the contrary, Sgt. Preston testified at his deposition that he never assigned Ms. Cherry to foot patrol as a punishment and that, instead, all officers are ordered to patrol by foot on occasion. (*See* Pl.'s Opp. Ex. 3 at 50-51.) Although the court may not grant summary judgment when there is a genuine dispute of material facts, Ms. Cherry's "own naked opinion, without more, is not enough to establish a *prima facie* case of discrimination." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (internal quotation and alteration omitted). As Ms. Cherry has offered no evidence, aside from her

own opinion, that foot patrol was assigned as a means of punishment or that it was never assigned to male officers, this work assignment does not support Ms. Cherry's claim of discrimination.[3]

As to her claim of discrimination in the granting of overtime, Ms. Cherry has not proffered any evidence indicating that Sgt. Preston personally denied her requests to work overtime. Although she observed that her name had been crossed off a list of officers requesting overtime work, she admitted at her deposition that she never saw Sgt. Preston cross her name off the list, nor has she provided any evidence to this effect. According to Sgt. Preston, only the district's Administrative Sergeant or District Major Bevilaqua had the authority to deny officers' requests for overtime. Ms. Cherry does not dispute this fact. Accordingly, the denial of requests to work overtime cannot form the basis of Ms. Cherry's claim that Sgt. Preston discriminated against her because of sex.

Finally, even if Ms. Preston has stated a *prima facie* claim of sex discrimination with regard to her denied request for leave, Sgt. Preston has offered a legitimate, nondiscriminatory reason for this denial. According to Sgt. Preston, he initially denied requests to take leave on the same day from both Ms. Cherry and Officer Anton Davis, because he thought he would be short officers on that day. When he realized that he had enough officers to allow one of them to take leave, he chose Officer Davis because he believed that Officer Davis had submitted his request first. Sgt. Preston explained at his deposition that in deciding whose leave request to grant, he "used first come first serve, not seniority, not who does the numbers, who put in for it first, because it's fair." (Pl.'s Opp. Ex. 3 at 85.) Although Ms. Cherry stated in her deposition that she saw that Officer Davis's request was time stamped and dated after her request, she does not contest Sgt. Preston's belief that Officer Davis's request was made earlier.

---

[3] Although Ms. Cherry further alleges that Sgt. Preston's request for her to respond to a call a block or a block and a half away by foot was discriminatory, this request hardly seems unreasonable. Indeed, Sgt. Preston testified at his deposition that such requests are routine and that he once ran a half-mile to respond to a call while on foot patrol. (*See* Def.'s Mot. for Summ. J. Ex. 3 at 51-52.)

As the Fourth Circuit has noted, "[i]t is the perception of the decision maker which is relevant," when considering whether the employer's legitimate nondiscriminatory reason for acting adversely against the plaintiff is credible. *Holland*, 487 F.3d at 217 (internal quotations omitted). In *Holland*, the employer's proffered reason for terminating the plaintiff was its president's belief that the plaintiff had threatened his supervisor. *Id.* at 214. Finding that the plaintiff did not provide sufficient evidence addressing whether the employer's president honestly believed the plaintiff was making threats, the court held that the plaintiff was unable to establish that the employer's reason for terminating him was pretextual. *Id.* at 215. The court noted that, even assuming the plaintiff did not actually threaten his supervisor, he still had to demonstrate that the employer could not have believed he had done so in order to prove that the employer's true motive was discriminatory. *Id.* at 217-18. Similarly, even if Ms. Cherry correctly observed that Officer Davis's leave request was time-stamped later than hers, she must still offer some evidence demonstrating that Sgt. Preston did not actually believe that Officer Davis's request was made first.[4] As she has failed to contest the credibility of Sgt. Preston's belief, she has not satisfied her burden of proving that the BPD's proffered reason for denying her request for leave was mere pretext for sex discrimination. Accordingly, Ms. Cherry cannot prevail on her sex discrimination claims.

*B.  Retaliation*

Ms. Cherry also asserts that the BPD retaliated against her by evaluating and disciplining her more harshly, and ultimately terminating her, because of her informal complaint to the EEOC in August 2006. Ms. Cherry did not, however, allege retaliation or describe any retaliatory acts in her November 30, 2006 EEOC complaint. (*See* Pl.'s Opp. Ex. 1.) Accordingly, Mr. Bealefeld first

---

[4] Furthermore, Ms. Cherry has not submitted any documentary evidence in relation to Officer Davis's leave slip.

argues that Ms. Cherry's retaliation claim should be denied for failure to exhaust administrative remedies.

A Title VII plaintiff must exhaust her administrative remedies before suing in court by filing a charge of discrimination with the EEOC. *See Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005). "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Evans*, 80 F.3d at 963. The Fourth Circuit has held that claims of retaliation for actions that follow the filing of an EEOC charge are reasonably related to the original complaint and thus may be raised for the first time in court. *See Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992); *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 303 (4th Cir. 2009) (noting that the Supreme Court's decision in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) did not affect the validity of *Nealon*).

Yet when a plaintiff's claims of retaliation could have been raised in her EEOC charge, this rule does not apply. *See Riley v. Technical Mgmt. Servs. Corp.*, 872 F. Supp. 1454, 1460 (D. Md. 1995); *see also Ang v. Procter & Gamble Co.,* 932 F.2d 540, 547 (6th Cir. 1991) (noting that "[r]etaliatory conduct occurring prior to the filing of the EEOC complaint is distinguishable from conduct occurring afterwards as no unnecessary double filing is required by demanding that plaintiffs allege retaliation in the original complaint"). One of the primary reasons for allowing plaintiffs to allege retaliation for the first time in court is that plaintiffs who face retaliation after filing one EEOC charge will likely be reluctant to file additional charges for fear of further reprisal. *See Jones*, 551 F.3d at 302. Yet if a plaintiff faces retaliation and *then* chooses to file an EEOC complaint, there is little reason not to require her to exhaust her retaliation claim by including it in her EEOC charge. Therefore, the normal rules of exhaustion must apply to claims of retaliation that

predate the filing of an EEOC charge. In this case, the harsh discipline and evaluations that Ms.

Cherry claims to have received in retaliation for informally reporting discrimination to the EEOC

occurred prior to her filing a formal charge of discrimination on November 30, 2006. As Ms. Cherry

has failed to exhaust her administrative remedies with respect to her claim of retaliation arising out

of disciplinary measures and poor performance reviews, the court must dismiss this claim.

To the extent that Ms. Cherry also claims that the BPD terminated her in retaliation for

reporting discrimination to the EEOC, this claim need not have been exhausted because it relates to

the facts described in Ms. Cherry's November 30, 2006 EEOC complaint and occurred after the

complaint was filed. Therefore, the court may consider Ms. Cherry's claim of retaliation with

respect to her discharge.

To state a *prima facie* case of retaliation, Ms. Cherry must demonstrate that: (1) she engaged

in a protected activity; (2) the BPD acted adversely against her; and (3) the protected activity and

the adverse action were causally connected.  *See Holland*, 487 F.3d at 218. There is no dispute that

Ms. Cherry engaged in protected activity when she reported discrimination to the EEOC or that her

termination constitutes an adverse employment action. Mr. Bealefeld contends that Ms. Cherry has

failed to prove a causal link between her reports of discrimination and the alleged retaliation.

To prove that her termination was causally connected to either or both of her reports of

discrimination to the EEOC, Ms. Cherry must demonstrate that the BPD fired her because of her

EEOC complaints. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657

(4th Cir. 1998). As "an employer cannot take action because of a factor of which it is unaware, the

employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to

establish the third element of the prima facie case." *Id.* In *Dowe*, the court found that the plaintiff

could not establish this causal connection because it was undisputed that the relevant decisionmaker

was unaware of the protected activity. *See id.* The court reached this conclusion despite noting that others who worked for the employer had learned of the plaintiff's EEOC complaint. *See id.* at 655.

Like the plaintiff in *Dowe*, Ms. Cherry has not presented any evidence demonstrating that anyone involved in the decision to terminate her knew about her EEOC complaints. Although Ms. Cherry stated that she told Sgt. Whilkettle about her informal EEOC complaint, she has not argued that he was involved in her discharge in any way. Indeed, the BPD's termination paperwork for Ms. Cherry includes the names of several supervisory officers, but contains no mention of Sgt. Whilkettle. (*See* Def.'s Mot. for Summ. J. Ex. 17.) In the absence of any evidence that the relevant decisionmakers were aware of Ms. Cherry's protected activity, Ms. Cherry cannot prove causation and fails to show a prima facie case of retaliation.[5]

## **CONCLUSION**

For the foregoing reasons, the defendant's motion for summary judgment will be granted. A separate Order follows.

March  9, 2010                                  _____/s/_____
Date                                                Catherine C. Blake
                                                    United States District Judge

---

[5] Even if she did proffer evidence sufficient to prove a *prima facie* case, given the multiple negative evaluations she received, it is unlikely she could prove that her poor performance was a pretextual reason for her firing.